# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIKE ROCHA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>　　　　　Defendant. | Case No.  1:15-cv-01298-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL<br>SECURITY APPEAL<br><br>(ECF Nos. 22, 25, 26) |

## I.

## INTRODUCTION

Plaintiff Mike Rocha ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from hyperlipidemia, gastroesophageal reflux disorder, knee problems, degenerative disc disease, borderline intellectual functioning, major depressive disorder, anxiety disorder, personality disorder, obsessive-compulsive disorder, and history of inguinal hernia

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge.  (See ECF Nos. 14, 16.)

1  status post repair.  For the reasons set forth below, Plaintiff's Social Security appeal shall be

2  denied.

3                                          **II.**

4                      **FACTUAL AND PROCEDURAL BACKGROUND**

5          Plaintiff protectively filed an application for a period of disability and disability insurance

6  benefits on October 27, 2011.  (AR 78.)  Plaintiff's application was initially denied on March 29,

7  2012, and denied upon reconsideration on January 8, 2013.  (AR 147-150, 154-158.)  Plaintiff

8  requested and received a hearing before Administrative Law Judge Danny Pittman ("the ALJ").

9  Plaintiff appeared for a hearing on December 5, 2013.  (AR 31-77.)  On February 28, 2014, the

10 ALJ found that Plaintiff was not disabled.  (AR 13-25.)  The Appeals Council denied Plaintiff's

11 request for review on June 24, 2015.  (AR 2-4.)

12         **A.     Relevant Hearing Testimony**

13         Plaintiff testified at a hearing on December 5, 2013.  (AR 37-59, 67-71.)  At the hearing,

14 counsel informed the ALJ that Plaintiff had begun working on November 11, 2013 and asked

15 that it be considered a trial period.  (AR 35.)

16         Plaintiff was born on September 16, 1960.  (AR 37.)  Plaintiff completed the eighth grade

17 and took special education classes.  (AR 39.)  Plaintiff is able to read and write but had difficulty

18 with all the core classes.  (AR 39.)  Plaintiff was 6 feet tall and weighed 205 pounds on the date

19 of the hearing.  (AR 37.)  Plaintiff is right handed.  (AR 37.)  Plaintiff is married and has three

20 adult children.  (AR 37-38.)  Plaintiff lives in a house with his wife and daughter.  (AR 38.)

21         Plaintiff worked doing ranch maintenance for several employers.  (AR 41.)  He was

22 basically lifting 50 to 80 pound bags of fertilizer all day long, putting them in a tank and

23 spraying them out in the fields, driving a tractor, digging trenches, trimming trees, building

24 fences, and doing basic machinery maintenance.  (AR 68-70.)  He did this for sixteen years in the

25 orange industry.  (AR 69-70.)   He worked full time and through several temp agencies as a

26 forklift operator.  (AR 41-42.)  Plaintiff last worked in 2011 and had begun working recently.

27 (AR 43.)  Plaintiff stopped working in 2011 due to back and neck pain.  (AR 43.)  When he quit

28 working he was thinking about things.  (AR 57.)  Plaintiff was able to keep up with his work at

                                          2

1  the time he quit, but would occasionally have someone pull up the door for him if his neck or

2  knee hurt.  (AR 57.)  Three weeks prior to the hearing Plaintiff began working 40 hours a week

3  for a temporary agency gluing bins at a packing house.  (AR 38-39.)  Plaintiff drives five days a

4  week.  (AR 39.)  Plaintiff recently volunteered at the church cleaning windows.  (AR 40.)

5       Plaintiff takes Tramadol and Ibuprofen for pain only when it is needed.  (AR 44.)

6  Plaintiff takes medication for anxiety but it does not help.  (AR 44.)  Plaintiff takes Zoloft for

7  depression and it sometimes gives him a headache.  (AR 45.)  Plaintiff takes his medication, but

8  just what he needs.  (AR 45.)  No doctor has recommended that Plaintiff have surgery for his

9  back.  (AR 46.)  Plaintiff had surgery to repair his hernia but it still hurts a little.  (AR 46.)

10  Plaintiff had injections for back pain but it has been awhile.  (AR 46.)  Plaintiff went to physical

11  therapy which helped while he was going.  (AR 47.)  Plaintiff used a cane over a year ago but no

12  doctor prescribed it.  (AR 47.)  Plaintiff was prescribed a back brace that he sometimes uses.

13  (AR 47.)  It helps but does not take the pain away.  (AR 47.)

14       Plaintiff had surgery for a hernia in August 2006.  (AR 56.)  He had noticed a bump and

15  would have pain when he leaned against a table.  (AR 57.)

16       After he quit working in 2011, Plaintiff had a lot of good and some bad times.  (AR 58.)

17  During the bad times he would stay in bed all day.  (AR 58.)  He would be in bed on a daily basis

18  and would not watch television or listen to the radio but would just lay there.  (AR 58.)  He

19  would do yard work if it needed to be done.  (AR 58-59.)

20       Plaintiff sees a doctor for his mental health issues but it does not help.  (AR 48.)  Neither

21  therapy nor medication helps his mental health issues.  (AR 48.)  Plaintiff is tired a lot because

22  he does not sleep.  (AR 49.)  Plaintiff's pain is not bad enough to keep him from working.  (AR

23  49.)  Since starting back to work Plaintiff missed one half day because he had too much anxiety

24  or did not get enough sleep.  (AR 49.)

25       Plaintiff sometimes has difficulty sitting for long periods of time when his back is

26  bothering him.  (AR 49.)  Plaintiff stands eight hours a day at his current job.  (AR 50.)  Plaintiff

27  pushes and pulls twenty pounds.  (AR 50.)  Plaintiff does not have memory problems but does

28  have trouble concentrating at times.  (AR 50.)  Plaintiff is having no problems concentrating at

1   work.  (AR 51.)  Plaintiff has not been in trouble for being off task at work but worries that he

2   could be laid off or fired.  (AR 51.)

3        Plaintiff has trouble getting to sleep and staying asleep.  (AR 51.)  He gets two to three

4   hours of sleep a night.  (AR 51.)  Plaintiff does not nap during the day.  (AR 51.)  Plaintiff is able

5   to care for his bathing and dressing needs except his wife helps him put his shoes on when his

6   back goes out.  (AR 52.)  Plaintiff's wife normally prepares all the meals.  (AR 52.)  She does all

7   the housecleaning, grocery shopping, and pays all the bills.  (AR 52-53.)  On occasion, Plaintiff

8   will do the dishes and take out the trash.  (AR 52.)  Plaintiff does mow the lawn.  (AR 52.)

9        Plaintiff goes to church as much as he can.  (AR 53.)  He is able to sit through the sermon

10  because they sit, stand or kneel.  (AR 53.)  Plaintiff is able to follow the sermon.  (AR 54.)

11  Plaintiff has grandchildren that he watches occasionally.  (AR 54-55.)  Plaintiff's wife is usually

12  there too, he does not have the patience to deal with them.  (AR 55.)  Plaintiff occasionally goes

13  to restaurants.  (AR 55.)  He goes camping one or twice a year.  (AR 55.)  He has not been

14  camping for a couple years.  (AR 55.)  Plaintiff occasionally goes to watch his grandson play

15  football.  (AR 55.)  Plaintiff goes to the mall with his wife if she drags him along.  (AR 55.)

16  Plaintiff used to walk but now that he has lost weight he feels too weak.  (AR 56.)

17       Plaintiff has a computer but has not used it in a long time.  (AR 56.)  He has no hobbies

18  at the moment.  (AR 56.)

19       Plaintiff's wife, Rita Rocha, also testified at the hearing.  (AR 60-67.)  Plaintiff spends

20  seventy to eighty percent of the time in bed in their room.  (AR 60.)  He does not watch

21  television with the family and hardly ever goes into the living room.  (AR 60.)  Plaintiff is

22  practically in their room all day long.  (AR 60.)  He has a table beside the bed where he keeps his

23  Bibles and stuff.  (AR 60.)  He reads his Bibles and watches Godly movies all day long.  (AR

24  61.)  Plaintiff is isolated every day except Saturday.  (AR 61.)  On Saturday, his wife's day off,

25  she will encourage him to go to the store, get some pizza, or visit their son.  (AR 61.)  He will go

26  out for a few hours and then goes back to the same thing.  (AR 61.)

27       Plaintiff's mental condition has not changed since he quit working in 2011.  (AR 61.)  He

28  went back to work three weeks prior to the hearing because he says the walls in the house are

4

caving in on him.  (AR 61.)  Plaintiff has a lot of anxiety and depression.  (AR 61.)  In her opinion, he is not mentally or physically able to work but is choosing to do so because he wants something to do.  (AR 61-62.)  Plaintiff is not capable of making decisions and changes his mind all the time.  (AR 62.)  Even for this hearing he could not make his mind whether he was going to attend or not.  (AR 63.)  He will tell his family that he wants them to take him and dump him in a shelter for men.  (AR 62.)  Plaintiff's wife would like him to go to a mental home for two, three or four months to find out what his mental problem is.  (AR 62.)  His main problem is mental.  (AR 62.)

Plaintiff has a lot of different illnesses now.  (AR 63.)  He has severe gastritis and cannot eat anything because his stomach is always hurting.  (AR 63.)  He cannot afford to get proper treatment.  (AR 63.)  He has a prostrate problem, severe hypertension, back problems, hernias, knee problems, depression, and anxiety.  (AR 63.)  Plaintiff's wife is unable to cope with it and is ready to divorce him because she cannot deal with him.  (AR 63.)

Plaintiff and his family have always had mental issues.  (AR 64.)  His sister was in a mental institute.  (AR 64.)  They have a lot of depression in their family.  (AR 64.)  Plaintiff has taken medication for his depression on and off.  (AR 64.)  He says that God tells him he does not need his medication and by going off the medication he is worse.  (AR 64.)  He has a good work history because he was taking his medication.  (AR 64.)  She and her son have been blackmailing him, trying everything, to get him to go back on his depression and anxiety medication.  (AR 64-64.)  He will not take his medication.  (AR 65.)  When he was taking his medication he was not as bad.  (AR 65.)  Plaintiff's wife thought he was taking his medications and just found that he is only taking them on and off.  (AR 65.)

Plaintiff's wife is concerned that he is not going to be able to continue working.  (AR 66.)  He has lost 45 pounds in the last 6 months due to his illnesses.  (AR 66.)  His boss is already telling him that he is not going fast enough.  (AR 66.)  She made him come to the hearing because she wants to know if he can go back to the workforce.  (AR 66.)  She cannot deal with supporting him any longer.  (AR 67.)

A vocational expert ("VE"), Jose Chaparro, also testified at the hearing.  (AR 67-76.)

**B.    ALJ Findings**

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2015.

- Plaintiff engaged in substantial gainful activity from November 11, 2013 until December 10, 2013.

- However, there has been a continuous 12-month period(s) during which Plaintiff did not engage in substantial gainful activity.  The remaining findings address the period(s) Plaintiff did not engage in substantial gainful activity.

- Plaintiff has the following severe impairments: degenerative disc disease, borderline intellectual functioning, major depressive disorder, anxiety disorder, personality disorder, obsessive-compulsive disorder, and history of inguinal hernia status post repair.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for six hours, and sit for six to eight hours in an 8-hour day with normal breaks.  Plaintiff is limited to occasional balancing, stooping, kneeling, crouching, crawling and climbing ramps and stairs, but no climbing ladders, ropes and scaffolds.  He is limited to occasional overhead reaching and simple, routine tasks with limited public contact.

- Plaintiff is unable to perform any past relevant work.

- Plaintiff was born on September 16, 1960, and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.

- Plaintiff has a limited education and is able to communicate in English.

- Transferability of job skills is not material to the determination of disability

6

because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

- Plaintiff has not been under a disability, as defined in the Social Security Act, from June 11, 2011, through the date of the decision.

(AR 18-25.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.

Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.

Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.

Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

## IV.

### DISCUSSION AND ANALYSIS

Plaintiff contends that the ALJ erred by failing to provide legally sufficient reasons to 1) reject the opinion of Dr. Gill that are supported by substantial evidence in the record; 2) reject the opinion of Plaintiff's treating mental health providers; 3) reject Plaintiff's pain and limitation testimony; and 4) failing to consider the length and arduousness of his work history. Defendant

1    counters that the ALJ 1) properly evaluated Dr. Gill's opinion and gave it little weight because it

2    was inconsistent with the objective medical evidence and Plaintiff's stated activities; 2) gave

3    appropriate weight to the opinions of the mental health providers; 3) gave severally legally valid

4    reasons to reject Plaintiff's pain and limitation testimony; and 4) Plaintiff's work history does not

5    require a finding of disability given his prior work was arduous unskilled physical labor.

6    Plaintiff replies that reversal is warranted because the ALJ failed to properly consider the opinion

7    of Dr. Gill; every examining physician found greater mental limitations than found by the ALJ;

8    and the ALJ erred in finding that Plaintiff's current attempt at work impeached his credibility.

9         **A.     Dr. Gill**

10        Plaintiff argues that the ALJ's rationale for rejecting the opinion of Dr. Gill is without the

11   support of substantial evidence in the record.  Defendant responds that the ALJ properly found

12   that Dr. Gill's opinion was contradicted by Plaintiff's demonstrated abilities and was not

13   supported by the objective medical evidence.

14        The weight to be given to medical opinions depends upon whether the opinion is

15   proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d

16   821, 830-831 (9th Cir. 1995).  In general, a treating physician's opinion is entitled to greater

17   weight than that of a nontreating physician because "he is employed to cure and has a greater

18   opportunity to know and observe the patient as an individual."  Andrews v. Shalala, 53 F.3d

19   1035, 1040-41 (9th Cir. 1995) (citations omitted).   If a treating physician's opinion is

20   contradicted by another doctor, it may be rejected only for "specific and legitimate reasons"

21   supported by substantial evidence in the record.  Ryan v. Commissioner of Social Sec., 528 F.3d

22   1194, 1198 (9th Cir.) (quoting Bayless v. Barnhart, 427 F.3d 1121, 1216 (9th Cir. 2005)).

23        Where the treating physician's opinion is contradicted by the opinion of an examining

24   physician who based the opinion upon independent clinical findings that differ from those of the

25   treating physician, the nontreating source itself may be substance evidence, and the ALJ is to

26   resolve the conflict.  Andrews, 53 F.3d at 1041.  However, if the nontreating physician's opinion

27   is based upon clinical findings considered by the treating physician, the ALJ must give specific

28   and legitimate reasons for rejecting the treating physician's opinion that are based on substantial

1    evidence in the record.  Id.

2        While the ALJ is required to consider the opinion of Dr. Gill as to Plaintiff's ability to

3    work, "[t]he treating physician's opinion is not, however, necessarily conclusive as to either

4    physical condition or the ultimate issue of disability." Magallanes v. Bowen, 881 F.2d 747, 751

5    (9th Cir. 1989).  On October 21, 2011, Dr. Gill wrote a note stating that Plaintiff was deserving

6    of permanent disability.  (AR 327.)  However, in the enclosed report, Dr. Gill stated that Plaintiff

7    was estimated to be able to return to work on April 21, 2012.  (AR 328.)  On February 29, 2012,

8    Dr. Gill completed a short-form evaluation for musculoskeletal impairments.  (AR 352.)  Dr. Gill

9    noted Plaintiff's range of motion was: flexion, 90 degrees; right lateral, 95 degrees; extension,

10   120 degrees; and left lateral, 30 degrees.  (AR 352.)  He noted numbness, left leg line to sciatic

11   nerve pressure; with normal motor and reflexes.  (AR 352.)  No atrophy was present.  (AR 352.)

12   Plaintiff had stiffness of left leg while walking, then loses balance.  (AR 352.)  Plaintiff had

13   reduced straight left leg raise.  (AR 352.)

14       On April 20, 2012, Dr. Gill opined that Plaintiff could never lift up to 10 pounds; never

15   carry 11 to 20 pounds; could sit 15 minutes, stand 18 minutes, and walk 10 minutes without

16   interruption.  (AR 356.)  In an 8 hour workday, Plaintiff can sit 15 minutes, stand 15 minutes,

17   and walk 10 minutes.  (AR 356.)  For the remainder of the 8 hours, Plaintiff must be lying down

18   to relieve pressure from his spine so he can be more comfortable.  (AR 356.)  Plaintiff sometimes

19   requires use of cane to ambulate, and goes slower and has pain without cane.  (AR 356.)

20   Plaintiff's ability to carry small objects is not effected by use of cane.  (AR 356.)  Plaintiff's

21   limitations are due to pain caused by disc degeneration.  (AR 356.)  Plaintiff can occasionally

22   reach overhead; never do other reaching or push/pull; can occasional handle, finger and feel due

23   to degenerative disc disease.  (AR 357.)  Plaintiff can frequently operate foot controls with his

24   right foot and occasionally operate foot controls with his left foot.  (AR 357.)  Plaintiff can

25   occasionally climb stairs and ramps, never climb ladders or scaffolds, balance, stoop, kneel,

26   crouch, or crawl.  (AR 358.)  He can never be exposed to unprotected heights, moving

27   mechanical parts, humidity or wetness, dust, odors, fumes and irritants, extreme cold or heat,

28   vibrations, or other conditions.  (AR 360.)  He can occasionally operate a motor vehicle.  (AR

359.) Plaintiff needs a quiet noise level. (AR 359.) Plaintiff's condition is aggravated by severe noisy areas and he gets anxiety symptoms. (AR 359.) Dr. Gill opined that Plaintiff was estimated to be able to return to work on August 20, 2012. (AR 360.)

In addressing the opinion of Plaintiff's treating physician, Dr. Gill, the ALJ stated:

> As for the opinion evidence, treating physician Dr. Gill's disability statements in 2011 and 2012 demonstrated a temporary disability only, did not indicate preclusion from all work activity, and did not specify work-related limitations or the medical evidence to support the cause for this limitation (Exhibits 5F, p. 3; 6F, p. 3). Dr. Gill noted in September 2012 that the claimant was unable to work because he could not stand for long periods (Exhibit 12F). He also reported that the claimant could never lift up to 10 pounds, never carry up to 20 pounds, sit for 15 minutes at one time and total in an 8-hour day, stand for 18 minutes at one time and 15 minutes in an 8-hour day, and walk for 10 minutes at one time and 10 minutes in an 8-hour day. He should never reach or push and pull with the right hand, and occasionally reach, handle, finger, and feel with the right hand. He could frequently operate foot controls with both feet, occasionally climb stairs and ramps, and never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. He should not be around exposure to unprotected heights, moving mechanical parts, humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, heat, vibrations, and occasionally operate motor vehicle. He felt the claimant could possibly return to work in August 2012 (Exhibit 9F). I give very little weight to Dr. Gill's opinion. He said that the claimant could only sit for 15 minutes out of 8 hour, although the claimant sat through the more than one hour hearing. He also said that the claimant could only stand for 15 minutes out of eight hours, although the claimant testified that he is standing for eight hours at work five days a week.

(AR 23.) The ALJ correctly noted that Dr. Gill's opinions provided a date by which Plaintiff was expected to return to work and the disability statements in 2011 and 2012 demonstrated a temporary disability only.

Additionally, the ALJ noted that Dr. Gill's limitations were contradicted by Plaintiff's demonstrated abilities. (AR 23.) Dr. Gill opined that Plaintiff was never able to push or pull, stoop, kneel, or crouch (AR 358), but Plaintiff was able to mow the lawn and do light yardwork. (AR 52, 237, 292, 423.) While Dr. Gill noted that Plaintiff could only sit for 15 minutes in an 8 hour workday, Plaintiff was able attend church during which he stated he could sit, stand, or kneel (AR 53, 239, 275, 294), and the ALJ noted that Plaintiff was able to sit through the hearing of more than one hour. (AR 23.)

While Plaintiff argues that his condition had improved over time and that is why he was able to return to work in November 2013, the ALJ considered that in January 2013 Plaintiff

reported that his back pain and depression had worsened since 2012.  (AR 20, 301.)  The ALJ

also considered that Plaintiff's thoracic spine x-rays have showed mild early degenerative disc

disease and lumbar spine x-rays showed mild to slightly moderate degenerative disc disease.

> As for the complaints of back, neck, and knee pain, in June 2011, thoracic spine x-rays showed C5-6 slight degenerative endplate bony osteophytosis right lateral region consistent with early degenerative disc disease.   There was minimal anterior degenerative endplate bony osteophytosis noted lower thoracic spine consistent with early degenerative disc disease  (Exhibit 4F, p. 3).  Lumbar spine x-rays showed mild to slightly moderate degenerative disc disease.  There was At [sic] L2-3 and L3-4 slight disc space narrowing with minimal degenerative endplate bony osteophytosis.  There was minimal disc space at T12-L1 and L2 (Exhibit 4F, p. 2).  Cervical spine x-rays showed C4-5 mild anterior degenerative endplate bony osteophytrisis consistent with early degenerative disc disease. There was a C5-6 and C6-7 mild to slightly moderate degenerative endplate bony osteophytosis with slight disc space narrowing and mild degenerative bony spur encroachment upon the exiting neural foramen (Exhibit 4F, p. 1).  The claimant has been treated with medications (Exhibits 6F, p. 2; 13F, p. 7).
>
> Cervical spine x-rays showed multilevel marginal osteophyte formation in conjunction with multilevel facet arthropathy (Exhibit 18F, p. 15).

(AR 22.)

Further, the only objective findings of pain and decreased range of motion in the record

are in 2013.  (AR 417, 468-470, 475.)  Examinations of Plaintiff's back prior to this date

generally reflect no objective findings or normal findings.  (AR 331, 332, 333, 335, 372, 373,

384, 380, 384, 385, 386, 387, 406, 408, 410, 412, 415, 417, 447, 471, 472, 473, 474, 475, 476.)

The ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported

by clinical findings.  Thomas, 278 F.3d at 957.

On December 13, 2012, Dr. Nordlicht, an agency physician opined that Plaintiff was able

to occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk and sit 6 hours in

an 8-hour workday; had unlimited ability to push and pull; could occasionally climb stairs or

ramps, balance, stoop, kneel, crouch, or crawl.; and never climb ladders, ropes or scaffolds due

to his back pain and degenerative joint disease.  (AR 119-120.)  Plaintiff was also limited in his

ability to reach overhead bilaterally.  (AR 121.)   In developing this opinion, Dr. Nordlicht

considered Plaintiff's medical records which demonstrated diagnosis of depression, anxiety,

OCD, severe neck, back, and leg pain; however, the examinations were not very detailed.  (AR

121.)

While the physician opined that Plaintiff deserved disability because of his degenerative disk disease and left leg pain due to severe sciatica from pressure on the spinal nerve, there is no MRI showing nerve root compression and the lumbar spine x-ray shows only mild to slightly moderate degenerative disk disease and the cervical spine x-ray only shows mild early degenerative disk disease. (AR 121.) The medical record demonstrated that Plaintiff has normal range of motion and only subjective numbness of the left leg with normal motor examination and reflexes. (AR 121.) On January 3, 2013, Dr. Gregg, an agency physician reviewed the record and opined that Plaintiff was capable of performing light work. (AR 126.)

The ALJ gave great weight to the State Agency medical consultants because he found the opinions to be consistent with the medical evidence. (AR 23.) The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). Here, Plaintiff testified that he was working in a packing house gluing bins. (AR 38.) In his job, Plaintiff was standing eight hours a day at work and could push or pull twenty pounds. (AR 50.) Plaintiff's ability to return to full time work and his stated ability to stand eight hours and push or pull twenty pounds is independent evidence to support the agency physician's opinion.

In this instance the ALJ set forth the medical record and stated his reasons for rejecting the opinion of Dr. Gill. The ALJ meets his burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Magallanes, 881 F.2d at 751 (quoting Cotton v. Bowen, 779 F.2d 1403, 1408 (9th Cir. 1989)). The Court finds that the ALJ set forth legitimate and specific reasons to reject the opinion of Dr. Gill that are supported by substantial evidence in the record.

### B.    Mental Health Opinions

Plaintiff also contends that the ALJ erred by rejecting the opinions of Dr. Ensom and Dr. Zhang who opined that Plaintiff had marked limitations which would preclude work activity.

1    Defendant counters that the ALJ properly considered that Dr. Zhang only opined a temporary

2    disability and that at the time Dr. Ensom provided his opinion he had only been treating Plaintiff

3    for one month.    Further, Defendant argues that the medical record, his wife's testimony

4    regarding his mental status when he takes his medication, and Plaintiff's ability to work forty

5    hours a week are inconsistent with Dr. Ensom's opinion.

6        In evaluating the weight to provide to a physician's opinion, the ALJ may consider the

7    length of treatment and frequency of examination; the nature and extent of the relationship, the

8    other evidence in the record that supports the opinion, the consistency of the opinion, the

9    specialization of the physician, and other factors.  20 C.F.R. § 404.1527(c).

10       1.    Dr. Zhang's Opinion

11       On January 14, 2012, Plaintiff had a psychological examination by Dr. Zhang at the

12   request of the Employment Development Department.  (AR 344-347.)  Plaintiff reported that he

13   had few friends but good family relationships and fair work relationships.  (AR 345.)  He also

14   reported fluctuations in mood and energy characterized by mania and depression.  (AR 345.)

15   Plaintiff stated that he gets up between 4 and 8 a.m. (AR 345.)  He takes care of own grooming

16   and hygiene needs, has a simple breakfast, and does light yard work.  (AR 345.)  The rest of his

17   day is spent reading his bible and resting in bed.  (AR 345.)  Plaintiff is able to go out alone.

18   (AR 345.)  He has some difficulty completing household chores.  (AR 345.)  Plaintiff goes to bed

19   around 9:00 and sleeps restlessly at night.  (AR 345.)

20       Plaintiff was casually and neatly groomed with adequate hygiene.  (AR 345.)  His speech

21   was reasonably articulate and within normal limits.  (AR 345.)  Plaintiff was able to volunteer

22   information spontaneously and had no overt psychomotor agitation or retardation.  (AR 345.)

23   Dr. Zhang found Plaintiff to be genuine and truthful with no evidence of exaggeration.  (AR 345-

24   346.)   Plaintiff's thought processes were coherent and organized, with no overt delusion,

25   hallucinations, or other signs of thought disorder.  (AR 346.)  Plaintiff described his mood as

26   depressed.  (AR 346.)  Plaintiff's affect was constricted.  Plaintiff reported a past suicide attempt

27   and suicidal ideation.  (AR 346.)  Plaintiff was alert and oriented in all spheres and had adequate

28   capacity to cooperate in evaluation.  (AR 346.)  Plaintiff's intellectual functioning was in the

moderately limited range and his fund of general knowledge was moderately limited.  (AR 346.)
Plaintiff had adequate memory for historical events, and was able to provide sufficient
background information for the evaluation.  (AR 346.)  Plaintiff's attention and concentration
were fair; and he occasionally needed redirection to remain focused on the evaluation process.
(AR 346.)  Plaintiff demonstrated moderately limited insight and fair judgment.  (AR 346.)  Dr.
Zhang diagnosed Plaintiff with bipolar disorder, personality disorder, and rule out borderline
intellectual functioning; Plaintiff had a Global Assessment of Function ("GAF") Score[2] of 55.
(AR 346.)

Dr. Zhang opined that Plaintiff demonstrates a history of chronic and marked mood
disturbances with at least one suicide attempt and frequent suicide ideation.  (AR 346.)  Plaintiff
shows inadequate personality as well as moderately limited to below average cognitive
functioning.  (AR 346.)  Plaintiff was expected to benefit from continued psychiatric care as well
as psychotherapy.  (AR 346.)  Plaintiff could return to work on April 14, 2012.  (AR 346.)

Dr. Zhang found no limitations in Plaintiff's ability to understand, remember, and carry
out simple one or two-step instructions; moderate limitations in Plaintiff's ability to understand,
remember, and carry out complex instructions; and marked limitations in Plaintiff's ability to
relate and interact appropriately with the public, coworkers, and supervisors.  (AR 346.)  Plaintiff
had marked limitations in ability to maintain adequate concentration, persistence and pace,
ability associated with common work activity including attendance and safety; ability to maintain
regular attendance and perform work activities consistently; moderate limitations in his ability to
accept instructions from supervisors, ability to accept instructions from supervisors, and ability
to perform work activities without special or additional supervision, and ability to manage
money on his own behalf.  (AR 347.)

The ALJ provided several reasons for giving limited weight to the opinion of Dr. Zhang.
The ALJ noted that Plaintiff had reported that he was prescribed psychiatric medications, but it

---

[2] "A Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning.  It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations."  Cornelison v. Astrue, 2011 WL 6001698, at *4 n.6 (C.D. Cal. Nov. 30, 2011) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 32 (4th ed.2000)).

was apparent that Dr. Zhang was unaware that Plaintiff not taking his medications.  (AR 22.)  There is substantial support in the record for this finding as Plaintiff's wife testified at the December 5, 2013 hearing that she just found out that Plaintiff had not been regularly taking his medication.  (AR 65.)  According to Ms. Rocha, Plaintiff has dealt with his mental problems with medication on and off, but for the past two and a half years Plaintiff has gotten really close to the Bible and to God, and he says God tells him that he does not need medications.  (AR 64.)  Ms. Rocha believed that by going off of certain medications Plaintiff's condition had definitely worsened.  (AR 64.)  Ms. Rocha stated that she had tried everything to get him to take his depression and anxiety medication, but he will not take them.  (AR 64-65.)  He was not as bad when he used to take his medication.  (AR 65.)  He is only taking his medication on and off.  (AR 65.)

Here, the ALJ considered that Dr. Zhang found Plaintiff had a GAF of 55 which indicates he has moderate symptoms such as flat affect and circumstantial speech, or occasional panic attacks, or that the claimant has moderate difficulty in social, occupational, or school functioning as defined by the DSM-IV-TR (Diagnostic and Statistical Manual of Disorders (4th Ed. Text Revised 2000), American Psychiatric Association).  (AR 22.)  "A GAF score between 51 to 60 describes 'moderate symptoms' or any moderate difficulty in social, occupational, or school functioning.  Although GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a useful measurement."  Garrison v. Colvin, 759 F.3d 995, 1003 n.4 (9th Cir. 2014).  The ALJ properly considered that the GAF score was inconsistent with the marked limitations opined in evaluating the medical statement.  Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005).

Additionally, the ALJ found that this was a one-time examination, and Dr. Zhang was not Plaintiff's treating physician.  Without having been familiar with Plaintiff's medical history and having treated him over a long period of time, Dr. Zhang was less able to accurately evaluate Plaintiff's long-term functional capacity.  (AR 23.)

The ALJ proffered legitimate and specific reasons supported by substantial evidence in

1   the record to afford limited weight to Dr. Zhang's opinion.

2           2.      Dr. Ensom's Opinion

3           The ALJ considered that Dr. Robert Ensom opined in December 2012 that Plaintiff's

4   mental illness would impair his ability to adapt to stresses common to the normal work

5   environment, work with supervisors, co-workers, or the public, and would need assistance from

6   others in order to achieve a socially acceptable standard of self-care.  (AR 23.)

7           Dr. Ensom first saw Plaintiff on October 17, 2012.  (AR 390-392.)  Plaintiff reported that

8   he had been back on his medication for about a year and a half.  (AR 390.)  The medications had

9   worked at first, but Plaintiff felt they were no longer helping him.  (AR 390.)  Plaintiff's

10  appearance was neat and well-groomed.  (AR 391.)  He was cooperative and made eye contact.

11  (AR 391.)  Plaintiff had appropriate affect with a depressed and anxious mood.  (AR 391.)

12  Plaintiff's speech was normal and thought process was intact.  (AR 391.)  Plaintiff had no

13  hallucinations or delusions.  (AR 391.)  His memory and judgment were intact.  Plaintiff had a

14  GAF of 50.  (AR 392.)

15          Dr. Ensom next saw Plaintiff on November 21, 2012.  (AR 403.)  Plaintiff complained

16  that his sleep was irregular and his appetite was decreased, but there was no weight loss.  (AR

17  403.)  Plaintiff's thought processes were within normal limits.  (AR 403.)  He had a depressed

18  mood.  (AR 403.)  Plaintiff was compliant with medication and had no side effects.  (AR 403.)

19  There was no efficacy with medication.  (AR 403.)  Plaintiff had a GAF of 50.  (AR 403.)

20          On December 15, 2012, Dr. Ensom completed a Mental Disorder Questionnaire for

21  Evaluation of Ability to Work.  (AR 401-402.)  Dr. Ensom opined that Plaintiff needed

22  assistance to keep appointments.  (AR 401.)  His posture, gait, mannerisms and general

23  appearance do not impair his ability to work.  (AR 401.)  There was nothing in Plaintiff's history

24  of family, education, marriage, employment, sickness or arrest that would impair his ability to

25  work.  (AR 401.)  Plaintiff had no abnormalities in orientation, memory, or concentration.  (AR

26  401.)  Plaintiff had significant impairment in judgment.  (AR 401.)  Plaintiff's level of

27  depression could impair his ability to work and function daily.  (AR 401.)  Plaintiff had no

28  hallucinations, delusions or paranoid thoughts, confusion, disorganized behavior, loosening of

associations or other disorganization of thought.  (AR 401.)  Plaintiff had significant impairment in mood swings and social isolation.  (AR 401.)  His activities of daily living were impaired to point where assistance was needed to achieve socially acceptable standard of self-care.  (AR 402.)  Social functioning was deficient to point it would impair ability to work with supervisors, co-workers, or the public.  (AR 402.)  Plaintiff's mental illness impaired his ability to adapt to stresses common to normal work environment.  (AR 402.)  Plaintiff did not have medication side effects that would impair his ability to perform normal work.  (AR 402.)  Plaintiff was not likely to improve in next 12 months.  (AR 402.)

Initially, at step two, the ALJ found that Plaintiff only had mild restrictions in his activities of daily living, and moderate difficulties in social functioning and in maintaining concentration persistence and pace.  (AR 19.)  The ALJ gave very little weight to Dr. Ensom's report, as he did not have a longitudinal history of treatment with the claimant.  (AR 23.)  At the time that Dr. Ensom completed his report, he had only seen Plaintiff on two occasions over a period of two months.

The ALJ also noted that in December 2012, Plaintiff reported that his mind was no longer racing and his obsessive-compulsive disorder symptoms had improved.  (AR 466.)  While Plaintiff still complained of some depression, his sleep was okay and he was feeling more calm. (AR 466.)  Examination notes show his mental status was within normal limits with improved depression.  (AR 466.)

On February 27, 2013, Plaintiff reported much fewer occasions of suicidal ideation, and the examination record reflects his depression is improved with medication efficacy.  (AR 464.) Other examination findings are within normal limits.  (AR 464.)

On April 17, 2013, Plaintiff's depression had not improved, but all other findings are within normal limits.  (AR 463.)

The ALJ noted that by June 2013, Plaintiff was less depressed and sleeping better with Ativan.[3]  Plaintiff reported on June 12, 2013, that he had suffered more depression while taking

---

[3] The Court notes that the ALJ stated August 2013, however the record cited was for June 2013.

1    medication for an infection.  (AR 462.)  He was having less depression, but was still depressed

2    and feeling anxious.  (AR 462.)  He was sleeping better with his medication.  (AR 462.)  All

3    other examination findings were within normal limits.  (AR 462.)  The remainder of the visits

4    with Dr. Ensom report similar findings.

5           On September 11, 2013, Plaintiff was seen complaining of continuing depression.  (AR

6    452.)  Plaintiff was depressed with a normal affect and his appearance was dysphoric.[4]  (AR

7    452.)  All other examination findings were within normal limits.  (AR 452-453.)

8           Plaintiff was seen on October 2, 2013.  (AR 449.)  Plaintiff was still depressed and his

9    medication was found to be minimally effective.  (AR 449.)  Plaintiff's affect was constricted,

10   but all other examination findings are within normal limits.  (AR 450.)  Plaintiff was stable.  (AR

11   450.)

12          Additionally, the ALJ noted that, "according to [Plaintiff's] wife's testimony, [Plaintiff]

13   would not have these limitations if he were taking his medications."  (AR 23.)  At the December

14   5, 2013 hearing, Ms. Rocha testified that Plaintiff has tried to fight his depression with

15   medications.  (AR 21, 64.)  She testified that Plaintiff does not take his medications and his

16   decent work history is because he took his medications in the past.  (AR 21, 64.)  While Plaintiff

17   argues that Ms. Rocha's testimony is inconsistent with the medical record which shows

18   compliance at every visit, it is the ALJ's responsibility to determine credibility, resolve conflicts

19   in the medical testimony, and resolve any ambiguities.  Andrews, 53 F.3d at 1039.  The ALJ's

20   decision is to be upheld where the evidence is susceptible to more than one rational

21   interpretation.  Id. at 1040.  Here, the ALJ determined that the opinions of the mental health

22   physicians were only entitled to limited weight because the doctors were not aware that Plaintiff

23   was non-compliant with his psychiatric medications.

24          First, contrary to Plaintiff's argument, the record does reflect noncompliance with

25   medication on August 21, 2013.  (AR 459.)  Further, while the record demonstrates that the

26   physician noted in the record that Plaintiff was compliant with taking his medication, contrary to

27   _____

28   [4] Mood of general dissatisfaction, restlessness, depression, and anxiety.  Stedman's Medical Dictionary 599 (28th Ed. 2006).

19

Plaintiff's argument, there is no record showing that Plaintiff was refilling his medication or that the notations of compliance were based on anything other than Plaintiff's representations that he was taking his medication as directed.

When Plaintiff was asked at the hearing if he was still taking his medication, he did not directly answer the ALJ's questions.

> Q Now, the depression, you're -- are you still taking the Zoloft for depression?
> A Sometimes it gives me a headache.
> Q So, you don't always take it?
> A No, I just -- it just gives me a headache.
> Q So, the Zoloft, does it help your depression?
> A Well, I've told them to put me on Prozac, and he says no that that's --
> Q So, the Zoloft doesn't help?
> A I mean, to me it's giving me a headache.

(AR 45.) Ms. Rocha also testified:

> Q So, I mean before 2011 he seemed like he had a pretty good work history.  So, he was doing much better before that or
> A He's always -- there -- can I say something and I'm under oath?  He has always, always had mental issues, his whole family.  I don't mean to be mean, but his sister was in a mental institute and his mom and his brother.  I mean, it runs in the family.  I don't know what their history is, but they have a history of a lot of depression in their family.
> But he's tried to fight it with medication on and off, on and off. But now, I'm going to be honest.  Now he has -- for the last two, two and a half years that he's been off he's gotten really close to the Bible and really close to God, which is not a problem.
> But he says God tells him that he doesn't need medications, that it's in the brain, that it's in the Bible.  And I think by getting off of certain medications had definitely worsened him to be honest.  I'm being honest.
> Q All right.
> A And I swear to God.  I'm under oath.
> Q But, I mean, like I said, he does have a really decent work history and he seemed like he was
> A Because he was on medication.
> Q Okay. I see, that's the difference.
> A I swear to God that's --me and my son have been trying to blackmail him, trying to give him anything, trying to do anything so we can get him back on his depression and anxiety medications.
> Q Well, do you think if he started taking his medications again --
> A He won't take them.
> Q he would be okay?
> A He won't take them.  He has a thing with God that he's not the Bible.  My daughter-in-law told me to give it to him on his food, on his water, on his drinks because we're so – we don't --but we've seen so much change in him and he just won't take anything.  I mean, he's got a mind of his own.  And don't nod your head because I'm under oath.
> Q But when he was taking the medications he was not as bad?
> A Because -- well, I didn't -- no, not as bad.  I'm being honest, not as bad, but he was taking them before, and used take two kinds.

Q All right.
A And I've been thinking that he's been taking them all this time and I just found out that he -- that sometimes he takes and sometimes he doesn't.

(AR 63-65.)

According to Ms. Rocha's testimony, Plaintiff's mental health condition had "not changed one bit" and was still the same. (AR 61.) Plaintiff returned to work three weeks prior to the hearing because the walls were caving in on him. (AR 61.) Ms. Rocha testified that Plaintiff had severe mental issues (AR 61-63), but that he has had mental issues his whole life (AR 64). Ms. Rocha stated that being off of his medications has worsened Plaintiff. (AR 64.) She can see a difference when he is on his medication. (AR 64.) There is substantial evidence in the record for the ALJ's finding that Plaintiff was not compliant with his medications and because the doctors were unaware of this noncompliance their findings were not entitled to controlling weight.

The ALJ provided legitimate and specific reasons for the weight provided to Dr. Ensom's testimony that are supported by substantial evidence in the record.

3.    Agency Physician Opinions

The ALJ gave great weight to the opinions of the agency physicians because they were consistent with the medical evidence. On March 26, 2012, Dr. Skopec completed a mental residual functional capacity assessment. (AR 88-90.) Dr. Skopec opined that Plaintiff had mild restrictions in his activities of daily living, and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence and pace. (AR 85.) Dr. Skopec found that Plaintiff's mental limitations were not severe enough to preclude work activities with low personal contact and simple and repetitive tasks. (AR 84.)

On December 3, 2012, Dr. Gregg, an agency physician completed a mental residual functional capacity assessment and found that Plaintiff had sufficient understanding and memory to complete short and simple tasks; had the ability to perform unskilled work and maintain attention in 2-hour increments; tolerate and maintain an ordinary work schedule without the need for close supervision; interact appropriately with the general public, co-workers, and accept usual supervision on a limited basis, adapt and take appropriate precautions to usual changes in the

work setting; and form simple goals for simple type work.  (AR 122-123.)

The opinions of the agency physicians are consistent with other independent evidence in the record.  Tonapetyan, 242 F.3d at 1149.  Specifically, as discussed above, Plaintiff's medical record demonstrates that he did have improvement after he began treatment with Dr. Ensom, and other then some depression he had normal examination findings.  Prior to returning to work Plaintiff spent his days reading and watching movies.  He attended church regularly.  Three weeks prior to the hearing he returned to work and was able to complete an eight hour day. Finally, his wife testified that Plaintiff was able to work when he was taking his medication.

The Court finds that the ALJ provided specific and legitimate reasons that are supported by substantial evidence in the record for the weight provided to the physician opinions.

## C.    Credibility

Plaintiff contends that the ALJ erred in making an adverse credibility finding.  "An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation and citations omitted). Determining whether a claimant's testimony regarding subjective pain or symptoms is credible, requires the ALJ to engage in a two-step analysis.  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).  The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted).  This does not require the claimant to show that his impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms.  Smolen, 80 F.3d at 1282.

Second, if the first test is met and there is no evidence of malingering, the ALJ can only reject the claimant's testimony regarding the severity of his symptoms by offering "clear and convincing reasons" for the adverse credibility finding.  Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1160 (9th Cir. 2008).  The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not

arbitrarily discredit the claimant's testimony.  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted).  Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors.  Lingenfelter, at 1040; Thomas, 278 F.3d at 958.  In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. . . ."  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284).

The ALJ noted several reasons to find that Plaintiff's pain and symptom testimony was not credible.  The Court finds that the ALJ articulated clear and convincing reasons to find that Plaintiff's pain and limitations were not as severe as alleged that are supported by substantial evidence in the record.

### 1.   Daily Activities

Plaintiff argues that the ALJ erred because his level of activity does not rise to the levels of full time activity at any exertion level.  However, there are two ways for an ALJ to "use daily activities to form the basis of an adverse credibility determination: if the claimant's activity contradicts his testimony or if the claimant's activity meets the threshold for transferable work skills."  Phillips v. Colvin, 61 F. Supp. 3d 925, 944 (N.D. Cal. 2014).  Here, the ALJ found that Plaintiff's daily activities are not as limited as one would expect given the complaints of disabling symptoms and limitations.  (AR 21.)

On January 14, 2012, Plaintiff told Dr. Zhang that he took care of his personal hygiene and grooming needs, went out alone, read the Bible, and rested.  (AR 21, 345.)  Plaintiff reported some difficulty in completing household chores, but did light yardwork and enjoyed visiting with his wife.  (AR 21, 345.)  Plaintiff was casually and neatly groomed with adequate hygiene.  (AR

345.)

On September 17, 2012, Plaintiff reported that he could only walk 100 feet, stand for 10 minutes, and sit for 10 minutes and drive. (AR 20, 284.) The ALJ noted that

> [Plaintiff] and his wife, Rita Rocha, reported that he had difficulty performing his personal grooming needs, but was able to prepare simple meals, mow the lawn once a week for 15 minutes (if back pain allowed), drive, read the Bible, and went to church once a week, but did not shop. He also indicated that his condition "affect[s]" certain activities, such as lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair-climbing, completing tasks, concentrating, and understanding; however, he failed to quantify any such limitations or explain how those areas are affected with the exception he could only walk for five minutes and then must rest for 10 to 15 minutes before resuming walking, but that is contrary to the medical evidence and the claimant's own testimony.

(AR 21, 291-298, 272-277.) The ALJ gave great weight to the claimant's fairly wide range of daily activities, and give little weight to the affected areas comments. (AR 21.)

In a report submitted on January 25, 2013, Plaintiff reported that his chronic low back and depression had become worse since April 2012. (AR 20, 301.) Plaintiff stated that the change had occurred in December of 2012. (AR 301.)

At the December 5, 2013 hearing, Plaintiff testified that he mows the lawn, does yard work, takes out the trash at times, goes to church, and is able to sit through the service and follow the message. (AR 21, 52-54.) He occasionally watches his grandchildren. (AR 21, 54-55.) Plaintiff's wife stated that since he stopped working in June 2011 he spends 70 to 80 percent of his time in his room reading all day and watching television. (AR 21, 60-61.) Plaintiff testified that he had been working 40 hours a week since November 11, 2013, and drives to work 5 days a week. (AR 21.) Plaintiff was able to stand for 8 hours and push and pull 20 pounds. (AR 21, 50.) He missed a half a day since going to work because he had some anxiety and did not get enough sleep. (AR 49.) Even if Plaintiff's activities suggest some difficulty in functioning, they may be grounds for discrediting his testimony to the extent that the activities contradict claims of a totally debilitating impairment. Molina, 674 F.3d at 1113.

While Plaintiff complained that he has difficulty concentrating, the testimony reflects that he spends the majority of his days reading and watching movies and regularly attends church and

is able to follow the sermon.  Also, although Plaintiff contended that he was unable to walk more than 100 feet or stand more than 15 minutes throughout the time period he was able to mow the lawn and do yard work.  On August 31, 2013, the medical record reflects that he was having pain and swelling in his groin area after cleaning his pool.  (AR 423.)  Additionally, Plaintiff's ability to work 8 hours per day even temporarily also belies his stated physical limitations.  The ALJ pointed to specific activities of daily living that support the conclusion that Plaintiff's pain and limitations are not as severe as he alleged.

## 2.   Conservative Treatment

The ALJ also noted that Plaintiff has not received treatment consistent with a chronic pain syndrome such as biofeedback, acupuncture, use of a TENS unit, or attendance at a pain management clinic.  (AR 20.)  Plaintiff indicates he was prescribed medications for back pain, knee pain, hypertension, and depression.  (AR 20.)  The ALJ also noted that in February 2013, Plaintiff declined pain management and only wanted Ibuprofen which suggests that his symptoms may not have been as limiting as the claimant has alleged in connection with this application.  (AR 22.)

Plaintiff argues that he was not able to obtain additional treatment because it was not available to him citing to a October 3, 2013 medical record in which Plaintiff reported that he had not had an MRI or CT scan or pain management due to lack of insurance.  (AR 468.)  However, Plaintiff has not pointed to and the Court finds no recommendation that Plaintiff receive an MRI or CT scan. Plaintiff did have x-rays which showed only mild to slightly moderate findings.  Further, no doctor recommended that Plaintiff needed surgery.  (AR 46.)  The record demonstrates that Plaintiff was seeing medical providers, indicated that he was taking his prescribed medication, and had surgery for a hernia repair.

Also, while Plaintiff argues that he did not accept the referral to pain management due to lack of insurance, the record notes otherwise.  When Plaintiff was offered pain management on February 26, 2013, he declined pain management stating that he was receiving medication from Dr. Gill.  (AR 412.)  On this date, Plaintiff reported that his back pain was okay with Ibuprofen which had been working to decrease his pain.  (AR 411.)  Examination revealed normal range of

1   motion, muscle strength, and stability in all extremities with no pain on inspection.  (AR 412.)

2   Review of the record supports the ALJ's findings that Plaintiff declined pain management

3   because he was not suffering from severe symptoms, rather than due to a lack of insurance.  See

4   Tommasetti, 533 F.3d at 1039 (ALJ may reject subjective severe pain complaints where claimant

5   is only receiving minimal, conservative treatment).

6       Substantial evidence supports the ALJ's finding that Plaintiff only received conservative

7   treatment for his severe impairments.

8       3.   Lack of Compliance

9       The ALJ also found that "the claimant has not been entirely compliant in taking

10  prescribed medications, which suggests that the symptoms may not have been as limiting as the

11  claimant has alleged in connection with this application."  (AR 21.)  An ALJ may consider a

12  claimant's failure to follow a prescribed course of treatment in considering his credibility.

13  Molina, 674 F.3d at 1113.  As discussed above, Ms. Rocha's testimony is substantial evidence to

14  support the ALJ's conclusion.

15  **D.   Work History**

16      Plaintiff alleges that the ALJ erred by failing to consider his arduous work history which

17  warrants disability under 20 C.F.R. § 404.1562.  Defendant counters that Plaintiff's prior work

18  history does not qualify under section 404.1562 because his work history does not demonstrate

19  only arduous unskilled physical labor as required.  Plaintiff's prior work history, as described by

20  the VE during the hearing, included periods of time which were for medium and semi-skilled

21  labor.  Plaintiff replies that the argument is well taken but that the ALJ was still required to

22  consider his long standing steady work history in evaluating Plaintiff's credibility.

23      Section 404.1562 applies if a claimant has only done arduous unskilled labor.  The VE

24  opined that Plaintiff did unskilled heavy labor, but he also worked as tractor operator, an

25  industrial truck operator, and a bin repairer which are all semi-skilled medium work.  (AR 70-

26  72.)  Therefore, section 404.1562 would not apply to Plaintiff.

27      In his reply, Plaintiff argues that the ALJ erred by failing to consider his prior work

28  record as required by 20 C.F.R. § 404.1529(c)(3) and Social Security Ruling 96-7p.  Section

1   404.1529(c)(3) states that in considering symptoms, including pain, the Commissioner "will

2   consider all of the evidence presented, including information about your prior work record, your

3   statements about your symptoms, evidence submitted by your treating or nontreating source, and

4   observations by our employees and other persons."   SSR 96-7p addresses what is to be

5   considered in addressing credibility.  Specifically, at the time that the ALJ issued the opinion at

6   issue here, SSR 96-7p stated factors to be considered in evaluating credibility would include, but

7   were not limited to "Statements and reports from the individual and from treating or examining

8   physicians or psychologists and other persons about the individual's medical history, treatment

9   and response, prior work record and efforts to work, daily activities, and other information

10  concerning the individual's symptoms and how the symptoms affect the individual's ability to

11  work."   Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the

12  Credibility of an Individual's Statements, 61 FR 34483-01, 1996 WL 36209, at *34486 (1996);

13  see also Albidrez v. Astrue, 504 F.Supp.2d 814, 822 (C.D. Cal. 2007) (ALJ may properly

14  consider a claimant's poor or non-existent work history in determining credibility).  However,

15  while work history is a factor that the ALJ considers in determining credibility, Plaintiff does not

16  cite to, nor is the Court aware of any requirement that an ALJ must discuss the work history in

17  the credibility section of the ALJ's decision.

18       Further, as discussed above, during the December 2013 hearing, the ALJ specifically

19  inquired into Plaintiff's prior good work history.  (AR 63-64.)  Based upon review of the record,

20  the ALJ did properly consider Plaintiff's prior work history in determining his credibility.  The

21  ALJ inquired whether Plaintiff was doing better during the time that he was working.  (AR 63-

22  64.)  Ms. Rocha stated that Plaintiff has had mental issues his whole life.  (AR 64.)  He was able

23  to work in the past because he was compliant with his medication.  (AR 64.)  The ALJ noted this

24  in his opinion.  (AR 21, 23.)  Here, while Plaintiff did have a long work history, the ALJ

25  considered Ms. Rocha's testimony that he was able to work in the past because he was taking his

26  medication, and the ALJ provided other clear and convincing reasons to reject Plaintiff's

27  testimony as to the severity of his symptoms and limitations.

28       The Court finds that the ALJ did not err in considering Plaintiff's prior work history.

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ did not err in the weigh provided to the medical opinions and in finding Plaintiff's testimony regarding the severity of his symptoms and limitations less than credible.  Accordingly,

IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Mike Rocha.  The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:   **November 30, 2016**

_____

UNITED STATES MAGISTRATE JUDGE